**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LUMBERMANS MUTUAL CASUALTY COMPANY,** | |
| Plaintiff, | |
| v. | **Case No. 07 C 0386** |
| **BROADSPIRE MANAGEMENT SERVICES, INC. and PLATINUM EQUITY, LLC,** | **Hon. Harry D. Leinenweber** |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

**I.    BACKGROUND**

On July 14, 2003, Lumbermans Mutual Casualty Company (hereinafter, "Lumbermans") and Broadspire Management Services, Inc. (hereinafter, "Broadspire") entered into a written purchase agreement whereby Lumbermans sold to Broadspire a third-party insurance administration business.  The purchase price was to be based on annual "earnout" payments calculated pursuant to formulae set forth in Sections 3.3 of the agreement to be paid over the succeeding four calender years.

Under Section 3.3(c) of the agreement, as promptly as "practicable" following the end of a calender year, Broadspire was obligated to prepare and deliver to seller an earnout report which was to "include in reasonable detail" Broadspire's determination of the respective payments due.  If some or all of the assets of the

purchased entity were to be sold by Broadspire prior to full payment having been made, under Section 3.3(e), at the option of the Lumbermans, Broadspire was to make a lump sum payment based on the present value of the estimated future earnout payments attributable to the assets to be sold, or to require the purchaser expressly to assume the earnout payment obligation.  The value of the lump sum payment was procedurally handled in a similar manner to the earnout payment.  Broadspire was to provide its estimate in the form of a "reasonably detailed summary of [its] calculation and the assumptions upon which it is based" in a document called a buyout report.

Section 3.3(g) gave Lumbermans ninety (90) days after receipt of an earnout or buyout report to review and accept or disagree.  During this ninety-day period, Broadspire was obligated to "make available to Lumbermans all books and records of the Company and the Subsidiaries in buyer's possession or control that are relevant to such review."  If, after review, Lumbermans disagreed with any such report, it "shall deliver to Buyer a Disagreement Notice setting forth in reasonable detail the basis for such disagreement and Buyer's determination of the payment required to be paid to Buyer under this Section 3.3."  Broadspire contends that this quote contains a typographical error:  the sentence should read ". . . Seller's determination of the payment. . . .  It has filed a separate suit seeking reformation.)  If Lumbermans was satisfied and did not disagree with Broadspire's reports, it was to deliver

an "Acceptance Notice" prior to the expiration of the review period "in which case the buyer's report was to be binding on the parties." If Lumbermans did neither, *i.e.*, deliver a Disagreement Notice or an Acceptance Notice, the buyer's report was also to be final and binding on the parties.

Section 3.4 set forth the procedure to be followed by the parties with respect to the service and receipt of a Disagreement Notice. This section obligated the parties to attempt in good faith to resolve the dispute within thirty (30) days of the date of the disagreement notice. In the event buyer and seller were not able to reach agreement within this thirty-day period

> the dispute shall be promptly referred to an independent accounting or appraisal firm of national reputation mutually acceptable to buyer and seller, or if the parties are unable to agree on such a firm within 10 days or such longer period as they may mutually agree) to PricewaterhouseCoopers LLP (the "Accounting/Appraisal Firm") for binding resolution.

Broadspire appears to have made and delivered all earnout and buyout reports required of it in a timely manner. Lumbermans has also made and delivered Disagreement Notices in response to each and every earnout and buyout report served on it by Broadspire. In addition to disputing Broadspire's calculations in the earnout and buyout reports, Lumbermans complained that it was not supplied with the relevant information so as to enable it to provide in reasonable detail its disagreement with Broadspire's calculations. Broadspire, on the other hand, contends that Lumbermans

disagreement notice lacked sufficient details so as to comply with Section 3.3(g)'s requirement of "reasonable detail" and seller's determination of the payment required so that Broadspire's reports are final and binding.

The parties sought but were unable to come to agreement during the thirty-day period subsequent to the disagreement notices. The parties were also unable to agree on an independent accounting or appraisal firm to arbitrate the disputes so as provided by Section 3.4, the disputes were referred to PricewaterhouseCoopers LLP (hereinafter, "PwC") for arbitration.

During the initial arbitration proceeding, Lumbermans reiterated its complaint of lack of relevant information and requested PwC to order Broadspire to turn over certain specified information. PwC granted the request on June 16, 2006 and ordered Broadspire to turn over specific documents and information. Shortly after issuing this order and before Broadspire complied, PWC recused itself from acting as arbitrator, citing a conflict of interest it had because it represented a business entity related to Broadspire.

The parties have been unable to agree on a replacement arbitrator. As a result Lumbermans filed this petition seeking a court order for Broadspire to provide discovery and to compel it to agree on a replacement arbitrator. Broadspire, in turn, has demanded that Lumbermans arbitrate pursuant to Section 14.11 of the contract which provides for dispute resolution through arbitration

in accordance with CPR Rules for Non-Administered Arbitration. Lumbermans argues that this provision expressly excludes earnout and buyout payment determinations under Article III, the purchase price determination provision.

## II. <u>DISCUSSION</u>

With regard to the appropriate arbitration provision for making the purchase price determination, Lumbermans is clearly right. Section 14.11 in its opening sentence states that "[e]xcept as provided for in Article III, the following shall constitute the exclusive procedures and remedies for all disputes arising out of or relating to this Agreement." Article III specifically provides for determination of the purchase price and provides its own dispute resolution procedure. Thus, the Court must now determine if and how the parties are to resolve the purchase price dispute after the recusal of PwC. Section 5 of the Federal Arbitration Act provides the answer. This section specifically authorizes a court to designate and appoint an arbitrator if for any reason there is a "lapse in the naming of an arbitrator . . . or filling a vacancy." 9 U.S.C. § 5. *See also, Schulze and Burch Biscuit Co. V. Tree Top, Inc.*, 831 F.2d 709, 716 (7th Cir. 1987). Here there is a vacancy created by the recusal of PwC and the inability of the parties to agree on a replacement. Accordingly, the Court will provide for the fulling of the vacancy. The Court orders the parties to submit within ten (10) days two names each of "independent accounting or appraisal firm[s] of national

reputation" to replace PwC. The Court gives the parties seven (7) days after the submission to make specific objections to the other's submissions. The Court will select one firm from the four.

The seller has requested that the Court order discovery. However, the scope of discovery is clearly in the hands of the arbitrator. Section 3.4 grants the arbitrator "sole discretion" to conduct the proceedings in the way it determines will assist in resolving the dispute. However, since the arbitrator prior to recusal did order Broadspire to produce certain discovery in relation to the initial buyer's report and since Broadspire has not complied the Court will order buyer to produce the discovery ordered by PwC. Section 7 of the Federal Arbitration Act specifically authorizes district courts to order production of books and records as required by an arbitrator. Here, PwC ordered production prior to its recusal and the Court now orders compliance with PwC's letter of June 16, 2006 (Exhibit C, Petition for Discovery in Aid of Arbitration and to Compel Arbitration).

Broadspire argues that the calculations of its earnout and buyout report are not arbitrable under Section 3.4 because Lumbermans has waived its rights to disputes Broadspire's calculations because its disagreement notices did not set forth "in reasonable detail the basis for" its disagreement. However, whether the disagreement notices were adequate is certainly within the purview of the arbitrator and not the court, particularly where, as here, the professed basis for failing to supply detail

was based on the claimed lack of relevant information supplied. Whether Lumbermans adequately disputed the buyer's report or whether it had sufficient information to do so is peculiarly within the competence of an "independent accounting or apprisal firm of national reputation" rather than within the competence of a federal court. The arbitrator is also to determine whether there is a typographical error, and thus whether Lumbermans has an obligation to submit its own determination of payment due as claimed by Broadspire.

Platinum Equity, Inc. has moved to have itself dismissed from the case. However, the Court will leave the determination of whether Platinum is a proper party to the arbitrator.

### III. CONCLUSION

In conclusion, the Court orders each of the parties to submit within ten (10) days two names each of "independent accounting or appraisal firm[s] of national reputation" to replace PwC. The Court gives the parties seven (7) days after the submission to make specific objections to the other's submissions.

The Court orders Broadspire to comply with the document request prepared and served by PwC dated June 16, 2006 within thirty (30) days.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** April 15, 2008